UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EUGENIA II INVESTMENT HOLDINGS
LIMITED (BVI),

                    Plaintiff,

               v.

ANTHONY BELISLE,

                   Defendant.

Civil Action No.:

**COMPLAINT
AND JURY DEMAND**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    Plaintiff Eugenia II Investment Holdings Limited (BVI) ("Eugenia"), for its complaint against defendant Anthony Belisle ("Belisle"), alleges:

## INTRODUCTION

    1.    This is an action for fraud and negligent misrepresentation. Plaintiff seeks to recover damages from Belisle for its losses in excess of $7.5 million arising out of its 2018 investment in the Limited Diversified Arbitrage Fund ("LDAF"), which was managed by Markel CATCo Investment Management Limited ("Markel CATCo").

    2.    The LDAF provided reinsurance to property and casualty insurance and reinsurance companies. In exchange for reinsurance premiums, LDAF took on the risk of insured claim payments arising from disasters such as hurricanes, earthquakes, and wildfires. Belisle promoted the fund to investors, including Plaintiff, as having a proprietary structure that would be effective to minimize the risk of severe investment losses. At critical moments during the hurricane season of 2017, Belisle lied to investors (or, at best, recklessly misled them). He assured them that the fund would either realize a gain or, at worst, suffer a small

{S2668383; 2}

loss because of the storms. In doing so, he misled investors, including Plaintiff, into believing that the risk mitigation concept of the fund—heavily touted in its promotional materials—was functioning as designed under extreme stress conditions.

3.      In truth, the LDAF fund was facing major losses, which Belisle knew, recklessly disregarded, or should have known.  But he nevertheless communicated falsely optimistic assessments because he was, at that very time, engaged in a huge "capital raise." He needed new investors; he also needed to induce his current investors to re-commit further investment for 2018.

4.      Plaintiff took Belisle's reassuring comments on performance throughout the 2017 hurricane season as proof that the fund's portfolio strategy and risk mitigation concept— so critical to its investment decisions—was working under extreme conditions. In reliance on those reassurances, Plaintiff invested an additional $10 million in the LDAF for 2018; and allowed the balance of its 2017 investment to be rolled over into 2018.

5.      It was not until mid-January 2018, after investors, including Plaintiff, had committed their capital for 2018 that Markel CATCo began to reveal the disastrous truth about 2017's performance.  The natural disasters that had occurred in 2017—including, famously, the three successive hurricanes Harvey, Irma, and Maria and the devastating wildfires in California—wreaked massive losses on LDAF's capital.  Belisle's phony assessments were revealed as false, but it was too late for Plaintiff to exit the investment.

6.      2018 was also a bad year for natural disasters. There were major typhoons followed by significant hurricanes, especially Florence and Michael.  At the end of the year, devastating wildfires scorched California (the Camp Fire and Woolsey Fire). As in 2017,

LDAF's highly touted (but deeply flawed) risk management features failed. As a result, investors, including Plaintiff, suffered severe losses. As soon as it was able, Plaintiff redeemed as much of its remaining investment in the LDAF as it could.  But Plaintiff had already sustained huge losses, including at least $7.5 million. Plaintiff sues here to recover its losses, which it would not have sustained had Belisle and his subordinates been truthful about the LDAF's structure and its losses in 2017.

7.      In November 2018, the SEC and the Bermuda insurance regulator launched investigations of the 2017 and 2018 Markel CATCo "loss reserves," which are supposed to reflect Markel CATCo's estimates for further obligations to pay claims for past events. In January 2019, Belisle and his number two executive, Alissa Fredricks, were both fired by Markel.  According to Markel, they were fired for lying to company executives and counsel about a romantic relationship between them.

**JURISDICTION AND VENUE**

8.      This Court has personal jurisdiction over Belisle because he is a resident of the State of Florida.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest or costs, and the case is between a citizen of a State and a citizen of a foreign state.

10.     For purposes of diversity, Plaintiff is a citizen of a foreign state.  Defendant is a citizen of Florida.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, defendant resides in this judicial district at 1814 4th Avenue N, Naples, FL 34102.

## STATEMENT OF FACTS

### Belisle, Markel CATCo, and the LDAF Fund

12.     Belisle was Markel CATCo's CEO and was also effectively in charge of the LDAF fund.

13.     During the years in question, Markel CATCo was a Bermuda-based investment manager to Markel CATCO Reinsurance Fund Ltd., which is a mutual fund company comprised of "retrocession" reinsurance funds, including the LDAF (which was one of four offerings).   Retrocession is the transfer of reinsurance risk from one reinsurer to another reinsurer. Essentially, Markel CATCo took on property and casualty reinsurance risk that was being "laid off" by other reinsurers (for example, companies such as Munich Re or Swiss Re). Those reinsurers, in turn, had provided reinsurance to insurance companies, which, in turn, had provided property and casualty insurance to policyholders.  In a nutshell, Markel CATCo was paid premiums to absorb a share of the risk of payouts by reinsurance companies to insurance companies for claims by insured policyholders arising out of natural disasters (hurricanes, earthquakes, fires, windstorms) as well as other catastrophic events like plane crashes and terrorist attacks.

### Plaintiff

14.     Eugenia is a company formed in 1999 under the laws of the British Virgin Islands.  It is an investment fund, and its objective is to obtain favorable investment returns through diversified investments.

**Belisle And His Subordinates Market Deceptively To Plaintiff**

15.    During the years 2015 to 2018, Plaintiff's principal investment analyst was David Hurdle.  Hurdle reported to Plaintiff's Board of Directors.

16.    Eugenia had the expertise of sophisticated financial professionals, but did not have any financial professionals that had training, experience or background in the arcane world of reinsurance-related investments.  Thus, Eugenia relied heavily, and justifiably, on the expertise, integrity, and good faith of Belisle and his subordinates when these Markel CATCo agents made representations about the LDAF and Markel CATCo.

17.    In late 2015, Eugenia became interested through various investment contacts in a possible investment in one of the funds managed by Markel CATCo.

18.    On Eugenia's behalf, Hurdle participated in a series of meetings and communications with Belisle and other Markel CATCo representatives in Los Angeles and New York City toward the end of 2015 and into the Spring, 2016.

19.    Markel CATCo explained to Plaintiff that it provided its reinsurance clients (called "cedents") with indemnity cover in exchange for premiums.  Indemnity cover is insurance coverage that pays for actual losses.

20.    Markel CATCo provided Plaintiff with informational and marketing materials that described the investment opportunity in the various funds managed by Markel CATCo that provided collateral for these retrocession policies.

21.    These marketing materials highlighted the experience of the "Markel CATCo Team," which included Belisle, "with more than 30 years' insurance and reinsurance

experience," and other key persons with extensive professional insurance and reinsurance credentials.

22.     The materials touted the historical success of the funds managed by Markel CATCo, including double-digit positive returns in each of the years disclosed.

23.     One of the selling points of the Markel CATCo funds was that their returns were "uncorrelated" to regular market returns.   The frequency or magnitude of natural disasters like earthquakes, hurricanes and wildfires is completely unrelated to the rise or fall of more common financial instruments (stocks, bonds, etc.).

24.     The other key selling point was the funds' structure, designed supposedly to minimize the risk of loss. A key risk management feature was referred to as "risk pillars." Another was hedging.

25.     The "risk pillar" was a structure that Markel CATCo touted as a safeguard against significant losses in any given year.   Each pillar defines a supposedly uncorrelated type of covered event, e.g., "Gulf Wind", "Florida Wind", "Aviation", "Terrorism", "Wildfire".   The structure's efficacy was based on two critical assumptions.   The first assumption was that few disasters could cause reinsurance claims that were significant enough to trigger coverage in any given year on even one pillar.    The second assumption was that it was exceptionally unlikely that more than one triggering event would occur in a year.

26.     According to Markel CATCo's investor solicitation materials, this is how the risk pillars worked. In a typical contract, a reinsurer, the cedent, would choose a bucket of perhaps eight to ten "risk pillars" for coverage.   Each pillar would cover various named territories and types of catastrophes (e.g., "Florida Wind," "US Quake," "Japan Quake"). But

even though eight to ten potential occurrences would be covered under a Markel CATCo retrocession contract, cedents could make a claim only on the first four. Each pillar would have the same coverage limit available (say, $10 million), but the amount of aggregate coverage available in any one year would be capped at four pillar limits, or $40 million. The premium for this retrocession policy would typically be set at the amount of one pillar limit (that is, $10 million).

27.     Markel CATCo's retrocession policies were fully collateralized by cash. Using the example above, if the policy limit was $40 million, $10 million would be funded through premiums paid by the reinsurance company to buy the policy. The remaining $30 million would come from investors, like Plaintiff.

28.     As noted above, the likelihood that any disaster would result in even a single claim on one of Markel CATCo's retrocession policies was supposed to be remote. According to its investor solicitation materials, the empirical probability was that the single claim would happen only once every 5.6 years.

29.     But no matter how big the total insurances claims were on a single event, Markel CATCo's reinsurance coverage for that event would be limited to one pillar. If no other event triggered losses during the year, the fund would do no worse than break even, since the premiums collected were sufficient to pay one pillar's entire limit of coverage.

30.     What is now clear (but was deliberately obscured then) was that if a second, third, or fourth triggering event occurred during the same coverage period, the claims paid on those events would translate into massive losses of investor capital.

31.     The other risk management feature consisted of the hedges that the LDAF would purchase to limit losses. But, as Plaintiff eventually came to understand, the hedges seem to have been designed to mitigate losses only on the first pillar. The hedges offered no apparent protection for losses on the second, third, or fourth pillars.

32.     Thus, while the "single event" risk for investors was understated, the most concerning risk for investors was from multiple catastrophic events. Yet Markel CATCo investor solicitation materials provided to Eugenia almost entirely disregarded the risk of multiple events in a year.  Instead, the materials relentlessly focused on the effects of a *single* natural disaster on the return on investment.  Markel CATCo represented that the LDAF was "hedged to not worse than minus 10% net" following "a single worst case loss event."  The LDAF Offering Memorandum stated that the investment manager "will endeavor to ensure that not more than 10 percent of the [LDAF's] capital would be exposed to a worse first single loss event."

33.     The marketing materials also falsely reassured investors in various ways about the probability of a multi-catastrophic event.  For example, they set forth a chart purporting to show the history of some of the worst historic natural disasters, and whether these catastrophic events would or would not have triggered Markel CATCo payout on its policies, if those events occurred now.  The chart stipulated a "contract trigger" of $30 billion in "industry loss, at which time Markel CATCo would have to initiate payments."  The chart stated that Hurricane Andrew (1992) had created an "industry loss" of $26 billion (updated for inflation); Hurricane Wilma (2005), $12 billion; and Hurricane Ivan (2004), $9 billion.  Thus, the chart suggested that, even if any of those massive hurricanes had occurred now, no coverage by

Markel CATCo would have been triggered, and Markel CATCo would not have paid a dollar to its cedents. The message to potential investors:  even a single "contract triggering" event was exceptionally unlikely, and a multiple triggering event close to impossible.

34.     The presentation was willfully structured to mislead.   Using Hurricane Andrew as an example:  Andrew devastated areas of the Florida and Louisiana coasts in 1992. Since then, there has been massive property development on those coasts.  Had a hurricane comparable to Andrew struck those coasts in the years in question, the damage would have vastly exceeded $26 billion.  For example:  the estimated insured loss in 2015, had a hurricane of Andrew's force struck then, was about $52 billion.   But the chart deliberately made no mention of that, thus falsely reassuring investors as to the number of "triggering events" in the past 45 years, and the unlikelihood of "triggering events" in the years that Plaintiff's investments would be exposed to natural disaster risk.

35.     In sum, the marketing materials, although couched with typical boilerplate disclaimers of investor reliance and riskiness, conveyed to investors the impression of a design and structure that offered an extremely reliable investment opportunity, with minimal risk of major losses of capital.

### 2016-2017:  Eugenia Invests

36.     Markel CATCo offered four different funds to investors depending on the investor's preference for hedging. The LDAF was in the middle in terms of the amount of hedging (neither the most nor the least hedged).  On April 1, 2016, relying on defendant's representations and promises, Eugenia invested $20 million in Eugenia through its nominee,

Barfield Nominee Ltd. (a/c GEN74).   It purchased 20,000 shares at a Net Asset Value per share of $1,000 (this was "Investment One").

37.     In August 2016, Markel CATCo provided Plaintiff with the latest version of its investor marketing deck (the "August 2016 Deck").

38.     The August 2016 Deck emphasized the effectiveness of the risk mitigation features of the investment. It calculated that a possible loss of 8% from one event would happen only 1 time in 20 years. Two such events in a single year was said to have a 1 in 200-year probability, in which case there would be a 20% loss to the LDAF.   The chance of three events was 1 in 2,500-years.

39.     2016 was a "quiet year" for natural disasters, and the LDAF returned a gain to its investors.

40.     In October 2016, Markel CATCo offered Eugenia its annual "election" as to the disposition of Investment One.   Eugenia could redeem, or, instead, elect the "deferred capital option" (which would expose it to potential profits and losses in 2017).   It elected the "deferred capital option."

### Three Devastating Hurricanes Strike While Belisle Is Attempting a Major Capital Raise

41.     In the Fall of 2017, defendant Belisle was on a major "capital raise" for Markel CATCo around the world.   The timing could hardly have been worse. During those intensive efforts, three catastrophic hurricanes in the Caribbean and the Atlantic—Harvey, Irma, and Maria—made landfall, imposing massive insurance losses.

42.     Harvey was a devastating "Category 4" hurricane.   It was designated a hurricane on August 24, 2017 and then struck Texas (August 26) and Louisiana (August 27).

Along with Hurricane Katrina, it is one of the two costliest hurricanes on record.   The National Oceanic and Atmospheric Administration estimated total damage at $125 billion, much of it in Houston and Southeastern Texas.   On September 3, 2017, Texas Governor Abbott estimated damage between $150 and $180 billion.

43.     Hurricane Irma formed during the final week of August 2017, made landfall on Barbuda as a Category 5 hurricane on September 6, 2017, and struck Florida as a Category 4 hurricane on September 10, 2017.   Approximately 6.5 million Floridians evacuated their homes; it was the largest evacuation in the state's history.   Georgia and North Carolina also declared states of emergency.   Irma was the third strongest Atlantic hurricane at landfall ever recorded.   It caused about $50 billion in damage.

44.     Hurricane Maria formed during the week of September 10 and became a tropical storm on September 16.   It reached Category 5 strength on September 18, then weakened slightly to a Category 4 hurricane, striking Puerto Rico on September 20, 2017 with winds of 155 mph.   Maria was responsible for an estimated 2,975 deaths in Puerto Rico alone. The power grid was destroyed by the hurricane, leaving millions without electricity.   By September 26, 95% of the island was without power and less than half the population of the island had tap water.   The US National Hurricane Center has estimated damage at $90 billion. Maria is widely regarded as the worst natural disaster to befall Puerto Rico in recorded history.

45.     As it turned out, the 2017 Atlantic hurricane season was the costliest tropical cyclone and hurricane season on record, with damage of about $300 billion in the United States.

46.     Thus, at the very time that Belisle was on a worldwide search for additional capital for Markel CATCo's 2018 funds, massive hurricanes were striking the United States and the Caribbean.  These hurricanes created widespread investor concern and threatened to derail Markel CATCo's capital raise.  So Belisle and his subordinates set about "reassuring" investors.

47.     On August 29, 2017, after Harvey had already struck Texas, Markel CATCo issued a press release stating that "if the total wind and flood insured losses remained below $10 billion the impact on the investment portfolio is not expected to be significant."

48.     On August 30, 2017, Belisle's subordinate Fredricks wrote to Christoffer Fellanius, who was advising Eugenia, that the LDAF was "hedge[d] to not worse than -10%"; and that, even in light of a $240 billion Gulf WS (windstorm) industry loss, the gross return on investment for the LDAF would still be -6%.  And the "RMS probability" of such an event, she said, was 10%".  (RMS is a private company that models risks and probabilities for the industry).

49.     On September 14, 2017, Belisle wrote to Hurdle, addressing "where we stand today with regard to the hurricanes."  By then, both Harvey and Irma had struck; and Maria was barreling toward Puerto Rico.  He said:

> While the reinsurance brokers are talking up Hurricane Irma, to try and get prices up (which we like), *I find it doubtful that the loss to FL, will be more than $10-$15 billion.* If so, then we may still have positive earnings for 2017 (assuming no other loss events for the last 3+ months) [see table below for each fund].  (emphasis added)

50.     The table to which he referred showed the "combined modeled impact of Hurricanes Irma and Harvey on Florida, Gulf and Caribbean risk pillars."  The document

indicated that CATCo's best estimate of a $10 billion Florida industry loss, a $10 billion Gulf WS industry loss, and a $10 billion Caribbean WS industry loss, with a 0% Florida and Gulf hedge benefit, would result in a loss impact of 14%.

51.     Belisle's estimates were, as he surely knew, sharply at variance with forecasts by highly reputable experts and the data being disseminated in the insurance industry at the time.  By September 14, Belisle had access to information from established industry sources that the impact from Harvey, Irma and Maria was likely to be materially above the $10 billion indemnity triggers on two if not three of the pillars. The "1 in 2,500 year" occurrence was now a distinct possibility and it would have a devastating impact on Market CATCo's investors. But none of that was mentioned to investors.

52.     This false reassurance was a great relief to Eugenia, which had come to fear an outcome far worse than a 14% loss in the LDAF.  Eugenia took Belisle's communications as proof that Markel CATCo's  risk-minimizing structure and hedges were effective, even under extreme pressure.

53.     By October 2, 2017, the last of the three hurricanes, Maria, had fully revealed itself to be another severe catastrophic event.  Yet, Markel CATCo issued a public statement that its Net Asset Value for 2017 following the three hurricanes would fall somewhere in the range of a 5% gain to a 15% loss.

54.     The October 2, 2017 CATCo forecast of a five percent gain to a fifteen percent loss was willfully misleading or utterly reckless, given the information that was being disseminated to reinsurance industry insiders like Belisle.

55.    Eugenia, of course, was not privy to this expertise, knowledge and industry information.  Relying on Belisle, Eugenia took the October 2, 2017 estimates as further proof of the efficacy of the Markel CATCo approach that had induced Plaintiff's original investment.

56.    The misinformation about LDAF's ability to withstand the pressure of these enormous storms was critical to Eugenia's investment decisions for 2018.

57.    On October 27, 2017, Mark Way, the Chief Operations Officer of CATCo and one of Belisles' subordinates, emailed Hurdle with a table showing "projected net return at December 31, 2017" for the LDAF of minus 8 percent (-8%). That projection, like the others before it, was indefensibly optimistic given the information that was then available concerning the devastation caused by Harvey, Irma, and Maria, plus the California wildfires, which had begun in October but had intensified in December 2017.

58.    Based on Belisle's misrepresentations, Eugenia decided to roll over the balance of the 2017 investments in LDAF into 2018; and to invest an additional $10,000,000 (Investment Two).

### Eugenia "Elects" To Reinvest Investment One, And To Add $10 Million In Additional Capital (Investment Two) To Its LDAF Investment

59.    At the start of the 2018 policy year, Plaintiff committed the additional $10 million.  It also elected to roll over whatever was left of Investment One for reinvestment in the 2018 policy year.

60.    Because 2017's losses would not be definitively known until the actual underlying insurance claims were liquidated by the insurance companies, Markel CATCo had to establish loss reserves (that is, estimates of a reinsurer's liability for future claim payments

on existing events); and set aside capital for the payment of those losses from the Funds' investment capital, which it would do by allocating invested funds into "side pockets."   (A "side pocket" is a type of account that is illiquid and set aside for a dedicated purpose:  here, payment of additional 2017 losses.)

61.     Markel CATCo only gradually released increasingly grim estimates of its loss reserves for 2017 throughout 2018—after Plaintiff had committed capital and funded the 2018 investments.

62.     In a January 18, 2018 report, Markel CATCo started to deliver the bad news for the 2017 investments.  Although, the industry loss estimates reported for 2017 remained roughly in line with the prior estimates, the impact of those losses on the returns for the LDAF changed dramatically for the worse. Markel CATCo was now projecting a loss for LDAF 2017 investors of -28.9%.   Because of the loss estimates and required side-pocketing of capital to collateralize LDAF's payment obligation, only 30.5% of Plaintiff's investment from 2017 (Investment One) would be available for investment in 2018.

63.     More bad news followed in May 2018: the loss reserve for 2017 funds would have to be increased by 14%, with a revised annual 2017 return now set at -42.12% for LDAF investors.

64.     LDAF's 2017 performance, as now disclosed, demonstrated that the structural risk protections of the "pillars" and the hedging had failed to protect against major losses under the impact of multiple natural disasters. Had Eugenia known this in the Fall and Winter of 2017, it never would have reinvested in 2018, much less added $10 million of investment

capital. But Eugenia had been convinced by falsely optimistic statements by Belisle and those working at his direction.

65.     Belisle and his team were experts in the insurance industry.  They also had access to internal information about the status of the investments and to proprietary industry information about the likely impact of the catastrophic events that were unfolding.  Eugenia's reliance on their statements and omissions had been reasonable.

66.     Now, by late 2018, Eugenia understood fully that it had been misled. Eugenia decided not to renew for 2019 and notified Markel CATCo in September 2018 that its accounts were to be redeemed.

67.     But Eugenia's withdrawal could not avoid huge losses in 2018, which were triggered mainly by hurricanes Florence and Michael, and the California wildfires; but were incurred because of the flawed risk management systems and pricing structure of Markel CATCo's scheme.  Indeed, as of November 30, 2018, Markel CATCo disclosed that it would reserve approximately 40% of 2018 investment capital for losses due primarily to the wildfires.

68.     But the investors were not the only ones who were alarmed at the misrepresentations of Belisle and his team. On November 30, 2018, Markel was contacted by U.S. (Securities and Exchange Commission) and Bermuda governmental authorities investigating Markel CATCo's loss reserves recorded in late 2017 and early 2018. On information and belief, those investigations are ongoing.

69.     In the end, LDAF's investors suffered massive losses in 2017 and 2018, but Belisle profited immensely, in part because of the intensive late 2017 capital raise.

70.     Under his employment contract, Markel CATCo agreed to pay Belisle a base salary of $1,000,000 per year, along with multimillion-dollar incentive payments.  Those incentive payments included a Continued Service Element ("CSE") bonus, and a Performance Element ("PE") bonus, if he remained employed in good standing with Markel CATCo during the period January 1, 2016 to December 31, 2018.  Belisle was the Chief Executive Officer of Markel CATCo until he was fired on January 18, 2019 for allegedly concealing a romantic relationship with his number two in command, Fredricks, and lying about it to counsel and to the parent's company's senior executives.

71.     The PE bonus was tied to the fee income of the various reinsurance funds. The fee income was driven, in part, by management fees based on the total assets under management, which Belisle juiced up with false statements and omissions about the impact of the 2017 storms. Under the PE bonus formula, Belisle was slated to receive $77,500,000 in January, 2019, of which he had allocated various amounts to Fredricks and other staff, leaving him an expected PE bonus of $53,450,000.

72.     With respect to the CSE, Belisle was given a total gross aggregate sum of $50 million. He allocated $12,500,000 of this amount to other Markel CATCo employees.  Of the $37,500,000 remaining, he was to earn one third ($12,500,000) on each of three vesting dates – December 31, 2016; December 31, 2017; and December 31, 2018.  Each such installment was to be paid within 30 calendar days after the applicable vesting date.  As of January, 2019, then, Belisle awaited a remaining CSE payment of $12,500,000.

73.     Thus, Belisle anticipated receiving a total from the PE and the CSE by January 30, 2019 of $65,950,000.

74.     Had Belisle not given investors falsely optimistic reports of the various funds' ability to withstand those catastrophic 2017 storms, he would not have been able to raise nearly as much generally, and certainly would not have had Plaintiff's investments in 2018.

**First Cause of Action: Fraud**

75.     Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1 – 74.

76.     Belisle made misstatements and omissions to Plaintiff in 2017 in order to downplay the disastrous impact of hurricanes Harvey, Irma, and Maria, and the California wildfires.

77.     Belisle made these misstatements and omissions in order to bolster his ability to raise money from new and existing investors such as Plaintiff.

78.     Belisle made other misstatements, as described above, through subordinates, which reinforced the notion that the LDAF and other funds had been able to withstand the impact of hurricanes Harvey, Irma, and Maria and, later, the wildfires, when he knew (or recklessly disregarded risks) that the losses would be far greater.

79.     Belisle had information available to him that alerted him—or should have alerted him—to the falsity of his statements about the likely impact of the 2017 hurricanes Harvey, Irma, and Maria, making his misstatements and omissions intentional or, at least, reckless.

80.     Belisle also had the motive and opportunity to mislead investors, in that his bonus, which would be measured in the tens of millions of dollars, depended in part on raising significant investment capital for 2018.

81.     Belisle further misled investors by failing to correct prior misstatements, withholding the truth about the impact to the LDAF and other funds until Plaintiff (and the other investors) had committed their investments for 2018.

82.     Belisle's misstatements and omissions were material to Plaintiff's investment decisions for 2018 and their assessment of the efficacy of LDAF's investment approach.

83.     Plaintiff relied on Belisle's misstatements and omissions in deciding to roll over their 2017 investment (Investment One) into 2018, and in investing an additional $10 million (Investment Two). It did so under the misperception that the risk mitigation concept of the LDAF was working under great stress, when just the opposite was true.

84.     In 2018, Plaintiff again suffered major losses for the same reason as 2017: the risk controls and structure were inadequate to deal with major triggering events.

85.     Plaintiff was damaged as a result of Belisle's misrepresentations and omissions in amount to be determined at trial, but believed to be greater than $7.5 million, representing its losses in 2018 and the cost of its capital locked into the 2018 side-pocket investments, plus the various fees and expenses it incurred as an investor.

### Second Cause of Action: Negligent Misrepresentation

86.     Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1-85.

87.     Belisle, as the CEO of Markel CATCo, holding a pecuniary interest in LDAF's ability to raise money for its 2018 investments, supplied false and misleading information for the guidance of investors, including Plaintiff, in assessing the performance of

the investment under the stress of the 2017 hurricanes Harvey, Irma, and Maria, and wildfires in California.

88.     Plaintiff justifiably relied on Belisle's statements and omissions in evaluating the 2017 performance of the LDAF fund and in deciding to invest for 2018.

89.     Belisle knew that Plaintiff was relying on the information he supplied and that he owed a duty to Plaintiff to convey reliable and accurate information about LDAF's performance and to update prior statements if they were materially inaccurate.

90.     Belisle failed to exercise reasonable care or competence in obtaining or communicating the information to Plaintiff and LDAF's other investors.

91.     Belisle's statements and omissions were material to Plaintiff's investment decisions for 2018 and its assessment of the efficacy of LDAF's risk management strategies.

92.     Plaintiff relied on Belisle's misstatements and omissions in deciding to roll over its 2017 investment into 2018, and investing an additional $10 million. It did so under the misperception that the LDAF's risk mitigation concept worked under great stress, when just the opposite was true.

93.     In 2018, Plaintiff again suffered major losses for the same reason as 2017: the risk controls and structure were inadequate.

94.     Plaintiff was damaged as a result of Belisle's misrepresentations and omissions in an amount to be determined at trial, but believed to be greater than $7.5 million, representing their losses in 2018 and the cost of its capital being locked into the 2018 side-pocket investments, plus the various fees and expenses it incurred as an investor.

WHEREFORE Plaintiff demands judgment against Belisle as follows:

(1) awarding compensatory damages in the amount of at least $7.5 million, plus the cost of capital locked into the 2018 side-pocket investments;

(2) awarding punitive damages;

(3) awarding costs, disbursements, interest, and such other and further relief as is just and proper.

### JURY DEMAND

Plaintiff demands a trial by Jury as to all issues triable of right by a jury.


Dated: Orlando, Florida
   October 23, 2020

FISHER RUSHMER, P.A.


By:  /s/ John Edwin Fisher  
   John Edwin Fisher
   jfisher@fisherlawfirm.com

390 North Orange Avenue
Suite 2200
Orlando, Florida 32801
407-843-2111
407-422-1080 (Facsimile)

*Of Counsel*
Sullivan & Worcester LLP
Paul E. Summit
1633 Broadway
New York, NY 10019
psummit@sullivanlaw.com

Solomon & Cramer LLP
Andrew T. Solomon
1441 Broadway, Ste. 6026
New York, NY 10018
asolomon@solomoncramer.com