UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
EUGENIA II INVESTMENT HOLDINGS
LIMITED (BVI),

                            Plaintiff,

                v.

ANTHONY BELISLE,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.: 2:20-cv-00843

:
:
:
:
:
:
:
:
:
:
:
:
:

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Eugenia II Investment Holdings Limited (BVI) ("Eugenia") submits this Opposition to Defendant's Motion to Dismiss the Complaint.

In his bid to cut off Eugenia's lawsuit for fraud and negligent misrepresentation pre-answer, pre-discovery, and pre-trial, Belisle cherry picks the Complaint's allegations and ignores controlling Florida and Eleventh Circuit Court of Appeals precedent, all to avoid accountability for his false statements and omissions to Eugenia in the Fall and Winter, 2017.

Belisle contends that the action must be dismissed because Eugenia did not specify governing law.  We deal swiftly with that.  Next, he argues that the statements cannot possibly be actionable, because "courts refuse to entertain fraud claims premised upon opinions" (Defendant's Memorandum in Support ("Def.

Mem.") at 17), and his and his team's statements were just "estimates." This too is plainly wrong. Fraud cases based on falsely expressed "opinion" are legion, particularly where the defendant has special access to information and expertise.

Next, Belisle contends that the generalized warnings in the Offering Memorandum of November 2015 "specifically contradict" the statements made almost two years later by Belisle, and thus Eugenia could not justifiably rely on those statements (Def. Mem. at 13, n.8). But an investment manager cannot disavow false reports about investment performance based on generalized pre-investment disclosures.

Belisle also contends (faintly) that he cannot be held liable for the statements of his subordinates. Finally, he argues briefly and without conviction against the negligence-based Count Two.

## STANDARDS ON A MOTION TO DISMISS

Rule 8(a)(2) of the Federal Rules of Civil Procedure ("FRCP") requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). On a motion to dismiss, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009). "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Crossroads Fin. LLC* v. *Alma-Mater Collection, Inc.*, 2020 U.S. Dist. LEXIS 192471, at *12 (S.D. Fla. Oct. 15, 2020) (quoting *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004)).

## CHOICE OF FLORIDA LAW

Belisle says the Court must dismiss the Complaint because Eugenia did not specify the governing law.  (Def. Mem. at 8-9). But no specification is required. *Jewelry Repair Enters. v Son Le Enters.,* 2016 U.S. Dist. LEXIS 190810, at *9 (S.D. Fla. Mar. 31, 2016). A District Court exercising diversity jurisdiction must "apply the substantive law of the state in which it is located," including that "state's law regarding choice of laws." *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990).  That means Florida law.  *See Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 882-83 (11th Cir. 1983) (applying presumption that foreign law is same as forum).  Belisle intimates that Bermuda or the BVI's law might apply (Def. Mem. at 8, n.4), without saying either should apply, discussing substance, or identifying any conflict.  Indeed, he cites Florida law alone for his motion; and Eugenia responds in kind.  Absent a proffer by a litigant of the substance of another state's law and the

existence of a conflict, this Court may presume that Florida's law is the same as these other jurisdictions' law and apply it. *Barnes v. Liebig*, 1 So. 2d 247, 252 (Fla. 1941).[1]

## THE REQUIRED ELEMENTS FOR PLEADING FRAUD

There are four elements of fraudulent misrepresentation under Florida law:

(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induces another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation.

*Grimes v. Lottes*, 241 So. 3d 892, 896 (Fla. Dist. Ct. App. 2018) (emphasis in original) (internal quotation omitted).   A plaintiff must "state with particularity the circumstances constituting fraud", FRCP 9(b).   Rule 9(b), however, does "not abrogate the concept of notice pleading," and is satisfied if the complaint sets forth:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation omitted).   These elements are all pled in the Complaint.

## THE FACTS AS ACTUALLY PLED

During the relevant years, Belisle was the CEO of Markel Catco ("Catco"), in charge of the Limited Diversified Arbitrage Fund ("LDAF"), a Catco fund that

---

[1] Belisle cites *Knights Armament Co. v. Optical Sys. Tech*, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008), and *Dell Inc. v. Sharp Corp. (In Re TFT-LCD (Flat Panel) Antitrust Litig.)*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011).   Neither considers the presumption of Florida law. *And see Kls Martin, Inc. v. Med. Modeling, Inc.*, 2018 U.S. Dist. LEXIS 225524, at *10-11 (M.D. Fla. Dec. 14, 2018) (rejecting argument that failure to plead state law required dismissal and distinguishing *Knights Armament* and *TFT-LCD*).

solicited investment.  (Cmpl. ¶¶ 1, 16).  Catco was a "reinsurer", an arcane business in which property and casualty insurance and reinsurance companies paid premiums to "lay off" risk onto Catco (Cmpl. ¶ 2, 13).  In 2015, Belisle boasted he had over 30 years of reinsurance experience and had pioneered "unique structures" in the industry.  (Doc. 16-6, Offering Memorandum, p. 31).

Eugenia is an investment fund.  In late 2015 and early 2016, Belisle induced Eugenia's LDAF investment of $20,000,000 ("Investment One") with misleading marketing materials (Cmpl. ¶ 36).  Those materials are relevant, but their falsity is not at the heart of the Complaint. Eugenia had no staff with any training or experience in the specialized world of reinsurance-related investments.  (Cmpl. ¶ 16).  It relied justifiably on the expertise, good faith, and integrity of Belisle and his subordinates.

In the Fall 2017, Belisle was on a major "capital raise" for Catco.  He had an enormous personal financial interest (described below) in the capital raise.  But the timing was disastrous.  Three hurricanes in the Caribbean and the Atlantic—Harvey, Irma, and Maria—made landfall, imposing massive insurance losses.  (Cmpl. ¶ 41)

Harvey struck Texas and Louisiana on August 26 and 27.  With Katrina, it is one of the two costliest hurricanes on record. (Cmpl. ¶ 42)

Irma formed in late August, hitting Barbuda and Florida on September 6 and September 10.  About 6.5 million Floridians evacuated their homes, the largest evacuation in the state's history.  Irma was the third strongest Atlantic hurricane ever recorded.  It caused about $50 billion in damage.   (Cmpl. ¶ 43).

Maria formed around September 10, striking Puerto Rico on September 20 with 155 mph winds, causing an estimated 2,975 deaths there.  By September 26, 95% of the island had no power; less than half the population had tap water.  The National Hurricane Center estimated damage at $90 billion.  It was the worst natural disaster in Puerto Rico's history. (Cmpl. ¶ 44).

The 2017 Atlantic hurricane season was the costliest cyclone and hurricane season on record, with damage of about $300 billion in the United States.  (Cmpl. ¶ 45). This confronted Belisle with an enormous challenge in luring new money into his funds. (Cmpl. ¶ 46)  And — unbeknownst to Eugenia — Belisle individually had a prince's ransom at stake.   As Eugenia now knows, Belisle was striving for enormous bonuses in January 2019.   One was the Performance Element ("PE") bonus, driven in part by assets under management in 2018.  Belisle juiced these assets up in his capital raise with false statements and omissions about the impact of the 2017 storms. (Cmpl. ¶ 71) Thus, Belisle was slated to receive a PE bonus of $77,500,000 in January 2019.   He had allocated amounts to Alissa Fredricks (his number two in command) and others, leaving him an expected PE bonus of $53,450,000.  (Cmpl. ¶ 71).  Belisle had also been promised a "Continued Service Element" bonus of $12,500,000.   So Belisle anticipated receiving $65,950,000 in January 2019 (Cmpl. ¶¶ 72, 73), driven significantly by the 2017 capital raise.  Had Belisle not given investors falsely optimistic reports of the funds' ability to withstand the catastrophic 2017 storms, he would not have been able to raise nearly as much

capital generally, and certainly would not have had Plaintiff's investments for 2018. (Cmpl. ¶ 74)[2]

In the Fall and Winter, 2017, Eugenia faced two investment decisions.   Its 2016 $20 million LDAF investment (Investment One) could be redeemed, or instead, "rolled over" into 2018.  Also, Eugenia was considering a further LDAF investment of $10 million (Investment Two). (Cmpl. ¶ 83)  But Eugenia expressed grave concern over the impact of the enormous hurricanes on the 2017 LDAF earnings.

The Complaint details the false statements and omissions of Belisle and his team to lure Eugenia into these two investments.  From late August through late October 2017, Belisle, the industry insider and expert, led a drumbeat of willfully misleading statements about what the 2017 results would show a few months hence (in January 2018).  And he chose not to correct them in November and December.

1. The August 29, 2017 Catco press release (Doc. 16-1). The release states that Harvey is "one of the worst storms in US history."  But then it states that "early estimates provided by the catastrophe risk modeling firms suggest insured wind losses of low single digit billions (USD)."  And it immediately reassures that, "if the total wind and floor insured losses remain below $10 billion the impact on the investment portfolio is not expected to be significant."   Eugenia alleges, "Belisle's estimates were, as he surely knew, sharply at variance with forecasts by highly reputable experts and the data being disseminated in the insurance industry at the

---

[2] Belisle is silent in his Memorandum on the capital raise, and his huge financial stake in it.

time." (Cmpl. ¶ 51).  Eugenia will prove that the "opinion" was false: it was not honestly rendered and was inconsistent with facts available to Belisle and his team.[3]

2. <u>The August 29 email (Doc. 16-2).</u>  On August 29, 2017, a Belisle subordinate wrote to Christoffer Fellanius (who was advising Eugenia), and to Belisle himself, with a copy to Mark Way, Catco's Director of Operations, that the LDAF was "hedge[d] to not worse than -10%"; and that, even in light of a $240 billion Gulf WS (windstorm) industry loss, the gross return on investment for the LDAF would still be -6%.

Belisle ignores the grossly misleading -6% figure.  He says it was not his statement, but avoids naming the author, Ms. Fredricks (Def. Mem. at 17).  (His relationship with Ms. Fredricks, his "number two" (Cmpl. ¶ 70), figures prominently in the Catco story, sees *infra*).  Fredricks indicates that the chart contains "approximate gross return distributions."  Belisle says the word "approximate" makes this a "nonactionable statement of opinion." (Def. Mem. at 18).  But "approximate" qualifies precision (meaning "nearly correct or exact: close in value or amount but not precise");[4] it does not immunize information not honestly rendered or contradicted by other, undisclosed, information in the speaker's possession.

---

[3] Belisle says he should not be held accountable for the press release; see *infra* for discussion of Belisle's responsibility for his small team's statements.   Belisle also says that Eugenia "does not allege that it acted in reliance on this preliminary prediction."  (Def. Mem. at 15) Actually, Eugenia alleged that it relied on all of the cited statements and omissions by Belisle and his team in the Fall and Winter, 2017 (Cmpl. ¶¶ 16, 83).

[4] *Wells Fargo Bank, N.A. v. Young,* 2019 N.J. Super. Unpub. LEXIS 849, at *4-5 (Super. Ct. App. Div. Apr. 11, 2019) (quoting *Merriam-Webster* Online Dictionary)

3.  <u>Belisle's September 15 update (Doc. 16-3)</u>.  Belisle, the insider expert, with 30 years' experience and access to proprietary models and data, emails David Hurdle, Eugenia's principal investment analyst, providing "my best estimate":

> I find it doubtful that the loss to FL will be more than $10-15 b.  If so, then we may still have positive earnings for 2017 (assuming no other loss events for the last 3 plus months [see table below for each fund].

As to the numbers in the attached table, Belisle is now silent.  The Complaint, however, alleges that the table's forecasts were "sharply at variance with forecasts by highly reputable experts and the data being disseminated in the insurance industry at the time." Cmpl. ¶ 51.  Moreover, while Belisle was reassuring investors with this data, he knew that the worst-case scenario, which had been downplayed previously as a "1 in 2,500 year" occurrence, was now a distinct and devastating possibility. He failed to mention that in his investor communication. (Cmpl. ¶ 51).

4.  <u>The October 2 Announcement (Doc. 16-4).</u>  The bulletins from Catco got even rosier.  Catco issued a remarkable statement that day, "currently estimat[ing] an NAV return for 2017 of between positive five percent to negative 15 percent."

5.  <u>The October 27 Statement (Cmpl. ¶ 57).</u>  Mark Way, Catco's Operations Chief, emailed Hurdle a table showing "projected net return at December 31, 2017" (i.e., just two months hence) of minus 8 percent for the LDAF.  But Belisle says, "All allegations of later statements [after October 26] are irrelevant because they post-date Eugenia's decision to reinvest on October 26."  (Def. Mem. at 20). Belisle is wrong.

First, the subscription documents (Doc. 16-9) have an "effective date" and "dealing date" of January 1, 2018. So, Way's October 27 email was still vitally

significant to Eugenia.  Second, Belisle ignores Investment One, the $20 million that could be redeemed or rolled over into 2018.  Even if October 26 was a final date for Eugenia's Investment Two decision (it was not), that is irrelevant to Investment One. And third, the October 27 email is obviously of great significance as further evidence of a pattern of misrepresentation and deceit.

These rosy assertions by Belisle and his team had their intended effect. Eugenia was greatly reassured.  LDAF's steadfast performance in the teeth of these historic storms was proof that its risk management structures worked. (Cmpl. ¶ 4). Eugenia decided to roll over Investment One ($20 million) and add another $10 million (Investment Two) for 2018. (Cmpl. ¶¶ 58, 59).

Once Belisle had finished his enormous 2017 capital raise, and Eugenia had committed to its investments, the harsh truth began to emerge.  That minus 8% projection of October 27, 2017 was quickly ancient history.  Even though industry loss estimates for 2017 remained roughly in line with prior estimates, the reported losses on the LDAF returns deteriorated dramatically. (Cmpl. ¶ 62).  On January 18, 2018, Catco was suddenly projecting a 2017 LDAF loss of -28.9%:  *over three times the loss projected on October 27,[5]* when Eugenia was still "in play" as a 2018 investor.  (*Id.*)[6]

---

[5] In a vain attempt to "draw the poison", Belisle says that the January 2018 report (Doc. 16-5) showed that "the additional loss reserves reported in the January 18, 2018 report were primarily to account for the California wildfires, which took place from October through the end of 2017."  Def. Mem. at 24.  This is obviously a fact issue way beyond the pleadings; but irrelevant as well (the exhibit states clearly that, as to the December wildfires, "far less insured exposure was impacted compared to the October wildfires….") (Doc. 16-5 at 3).

[6] And note:  through November and December, while Eugenia could still have changed its investment decisions, not a word issued from Belisle to correct his August to October false statements.

More terrible news followed: in May 2018, the loss reserve for 2017 funds increased by a *further* 14%, with a 2017 return now set at *-42.12%* for LDAF investors.

Eugenia had had enough.  It notified Catco in September 2018 that its accounts were to be redeemed.  (Cmpl. ¶ 66) But Eugenia's withdrawal could not avoid huge losses for 2018, triggered by 2018 hurricanes and wildfires, and incurred because of the flawed risk management systems of Catco's scheme.  (Cmpl. ¶ 67).  On November 30, 2018, it emerged that U.S. (SEC) and Bermuda government investigators had taken notice of Catco and Belisle (Cmpl. ¶ 68), and had opened investigations into Catco "loss reserves" for 2017 that are ongoing.  (Cmpl. ¶ 68).  On January 18, 2019, Belisle and Fredricks were fired for allegedly concealing their romantic relationship and lying about it to investigating counsel and to senior executives of the parent company.  (Cmpl. ¶ 70).

## FACT VERSUS OPINION

Fraud requires a "false statement of fact"; but the opinion of someone "with superior knowledge on the subject of the statement" is "treated as a fact." *Grimes*, 241 So.3d at 896-97. And every opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015).[7] Whether a representation is "a fact or an opinion requires consideration of the surrounding circumstances," *Grimes,* 241 So.3d at 896, and thus is typically not capable of resolution on the pleadings, *see Tres-AAA-Exxon v. City First Mortg., Inc.,* 870 So. 2d 905, 907-08 (Fla. Dist. Ct. App. 2004).

---

[7] Belisle cites *Omnicare*, Def. Mem. at 19, but ignores the relevant holding, quoted above.

Belisle argues that the misstatements alleged in the Complaint are opinions and, thus, cannot be the basis for a misrepresentation claim. But this argument is not available to him because of his superior knowledge and access to information that was not generally available to Eugenia. It is certainly not an argument that can prevail on a motion to dismiss.

*Fresh Results, LLC v. ASF Holland*, B.V., 2020 U.S. Dist. LEXIS 2662 (S.D. Fla. Jan. 8, 2020), is illustrative. Plaintiff was a produce buyer; defendant agreed to resell for plaintiff in Europe on consignment. Plaintiff alleged that defendant induced it to contract by stating prices anticipated on the resale that it knew were inflated. *Id.* at *5. Moving to dismiss, defendant argued that the anticipated prices were "simply opinions or projections of future sales" that could not "constitute misrepresentations of material fact." *Id.* at *7. The District Court denied the motion, noting defendant's "superior knowledge"; defendant "knew the provided reference prices were inflated based upon its knowledge regarding the market for berries in Europe and its communications with customers regarding what prices they were willing to pay, and how much volume they wanted." *Id.* at *10. That is indistinguishable from the allegations about Belisle's superior industry knowledge, and his access to information contradicting his statements about the 2017 results.

Nor can the complexity of the subject matter be disputed. Reinsurance has its own vocabulary ("cedents", "retrocession") and unique structures. [8]   Eugenia was untutored in it.  (Cmpl. ¶ 16). Belisle had 30 years and a supposedly expert staff, with information (claims, damage models, LDAF assets, "hedging strategies") that Eugenia could not possibly access.

The "superior knowledge" cases are a rich vein in Florida and the 11th Circuit.  *See e.g. Thor-Bear*, *Inc. v. Crocker Mizner*, 648 So. 2d 168 (Fla. Dist. Ct. App. 1994) (representation treated as fact if coming from one with superior knowledge); *ASJ Drugs Inc. v. Berkowitz*, 459 So. 2d 348, 350 (Fla. Dist. Ct. App. 1984) (dismissal reversed; "opinion" sufficient when combined with superior knowledge); *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. Dist. Ct. App. 2001) (professional's promise about future events when she knew they were false is sufficient).

Belisle also claims that the statements are not actionable because they contain estimates. This too fails. In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999), defendant Westinghouse made "estimates" in payment claims that, it said, could not be fraudulent as mere estimates.  The court said an estimate "carries with it an implied assertion, not only that the speaker knows *no facts which*

---

[8] The Eleventh Circuit has recognized the complexity.  *See Am. Bankers Ins. Co. v. Nw. Nat'l Ins. Co.*, 198 F.3d 1332, 1335 (11th Cir. 1999) (reinsurance contracts are sophisticated documents); *Public Risk Mgmt. of Fla. v. Munich Reinsurance Am.*, 2021 U.S. Dist. LEXIS 12364, at *29 (M.D. Fla.) (same). *See also Selcke v. New England Ins. Co.*, 995 F.2d 688, 689 (7th Cir. 1993) (reinsurance "arcane practices and usages"); *Ind. Lumbermens Mut. Ins. Co. v. Reinsurance Results, Inc.,* 513 F.3d 652, 653-654 ("dauntingly complex, esoteric field").

*would preclude* such an opinion, but that he *does know facts which justify it*." *Id.* at 792. (citing PROSSER & KEETON ON THE LAW OF TORTS § 109 (5th ed. 1984).[9]

Belisle admits that "hypothetically" it would be "possible for a plaintiff to allege that a defendant provided one estimate when he actually believed a different estimate to be correct." (Def. Mem. at 19, n.10).   But, he summarily adds, "that requires supporting allegations, of which there are none in the Complaint." (*Id.*)

In fact, there is a plethora of supporting allegations.   Cmpl. ¶ 51: Belisle's "estimates" were "sharply at variance with forecasts by highly reputable experts"; Belisle had access to information from established industry sources that the impact of the hurricanes was likely to be materially above the $10 billion indemnity triggers on two if not three of the pillars; a "devastating impact" on LDAF investors was a distinct possibility).   ¶ 54: the October 2nd forecast was willfully misleading, given the information being disseminated to reinsurance industry insiders.   ¶ 57: the October 27 projection was indefensibly optimistic given information then available. ¶ 68: SEC and Bermuda governmental authorities launched investigation of Catco's 2017 loss reserves.   ¶ 71: Belisle's enormous bonuses were tied to the capital raise of 2017, which required the false statements and omissions.   ¶ 7: Markel fired Belisle and Fredricks for lying to company executives and counsel.

The cases Belisle relies on are easily distinguished.   *Douse v. Bos. Sci. Corp.*, 2018 U.S. Dist. LEXIS 122386 (M.D. Fla. July 23, 2018) (Def. Mem. at 22-23),

---

[9] *See also United States v. United Techs. Corp.*, 255 F. Supp. 2d 779, 782-83 (S.D. Ohio 2003) (rejecting arguments that estimates are inherently subjective, vague and uncertain).

which Belisle says is "indistinguishable," is a medical product liability case. The alleged misstatements were vapid puffery on the manufacturer's website: "trusted performance," "timeless design" *Id.* at *7-8. The allegations here are not website puffery ("trust us"), but false statements about Eugenia's existing 2017 investments, ostensibly based on facts and rendered honestly, by the CEO, directed to Plaintiff, about on-going cataclysmic events, while inducing millions in 2018 investment.[10]

Here, the allegations present a powerful case that Belisle was not telling the truth (Belisle's acute personal motive and opportunity to lie; his special access to information; the timing of the capital raise, and then, the sudden January 2018 release of the terrible investment news) (Cmpl. ¶¶ 62, 70-73).

Finally, Belisle's argument that the August 29 email is not actionable because the information is introduced by the word "approximate" is not supported by the cases he cites – *Mich. Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019

---

[10] Defendant offers a scattershot of inapposite cases that can be handled briefly.  *See Kramer v Unitas*, 831 F. 2d 994 (11th Cir. 1987) (summary judgment; empty "puffing" was not a representation, false or otherwise); *Silver v. Countrywide Home Loans, Inc.,* 760 F. Supp. 2d 1330 (S.D. Fla. 2011) (summary judgment; mere puffing); *Wasser v. Sasoni,* 652 So. 2d 411 (Fla. Dist. Ct. App. 1995) (summary judgment; puffing as to "very good building"; *caveat emptor* for building purchase); *Extreme Crafts VII, LLC v. Cessna Aircraft Co.*, 2011 U.S. Dist. LEXIS 163003 (S.D. Fla. Oct. 3, 2011) (summary judgment; Kansas law; no superior knowledge);  *Century 21 Real Estate Corp. v. Remax S. Cnty*, 882 F. Supp. 915 (C.D. Cal. 1994) (summary judgment; Lanham Act; magazine advertisement); *In re Triangle Capital Corp. Sec. Litig.*, 2019 U.S. Dist. LEXIS 36639 (E.D.N.C. Mar. 7, 2019) (securities case under Private Securities Litigation Reform Act of 1995; distinct standards); *Duty Free Americas v. Estee Lauder Cos.,* 2014 U.S. Dist. LEXIS 43673 (S.D. Fla. Mar. 31, 2014) (Lanham Act claim of false advertising; plaintiff had had "extensive discovery"); *Fung-Schwartz v. Cerner Corp.*, 2019 U.S. Dist. LEXIS 156920 (S.D.N.Y. Sept. 13, 2019) (*implied* representation; unparticularized; failure even to allege falsity); *Azar v. Am. Home Mortg. Servicing,* 2010 U.S. Dist. LEXIS 140994 (M.D. Fla. July 16, 2010) (mere fact of loan approval is not a "false statement of fact"; and, no superior knowledge); *Brake v. Wells Fargo Fin. Sys. Fla.,* 2011 U.S. Dist. LEXIS 146875 (M.D. Fla. Dec. 5, 2011) (plaintiffs conceded statements were non-actionable).

U.S. Dist. LEXIS 53577, *85-86 (M.D. Fla. Mar. 29, 2019), and *Phoenix Trading, Inc. v. Lopez LLC*, 732 F.3d 936, 945 (9th Cir. 2013).  (Def. Mem. at 18).  *Mich. Carpenters*, was a federal securities fraud claim governed by the PSLRA. The "projections" there were "unequivocally forward-looking," which the court found to be within a "safe harbor" under the securities law. *Phoenix Trading* was a defamation suit, not a fraud claim.

## BELISLE IS RESPONSIBLE FOR THE STATEMENTS AND OMISSIONS

Belisle says the Court must ignore any statements that he did not personally write (Def. Mem. at 9 n.6; 16). This is wrong.

First, the argument is premature; Belisle cites post-trial decisions. [11]  (Def. Mem. at 16-17). The allegations about his role more than suffice at this stage.

Second, fraud liability extends to persons who directed, authorized or participated in a statement's dissemination. *Taylor Newman Cabinetry, Inc. v. Classic Soft Trim, Inc.,* 436 F. App'x 888, 890-91 (11th Cir. 2011) (internal quotation omitted) (under Florida law, officers or agents of corporations may be liable if they commit or participate in a tort); *see also Segal v. Rhumbline Int'l*, 688 So. 2d 397, 399 (Fla. Dist. Ct. App. 1997) (officer could be liable for orchestrating fraud though others made the representations).  Catco was not Walmart or Exxon.  The statements were issued by Belisle or his senior executives.

---

[11] *Checkers Drive-In Rests., Inc. v. Tampa Checkmate Food Servs.,* 805 So. 2d 941, 944 (Fla. Dist. Ct. App. 2001) and *Cameron v. Outdoor Resorts of Am., Inc.,* 611 F.2d 105, 107 (5th Cir. 1980).

Third, as to press releases, like the one on August 29, 2017, group pleading satisfies Rule 9(b). *See Phillips v. Sci-Atlanta, Inc.,* 374 F.3d 1015, 1019 (11th Cir. 2004). Belisle was CEO and controlled the LDAF (Cmpl. ¶ 1); these allegations suffice to attribute to him the statements in the press release (*see e.g.* Cmpl. ¶ 12).

Fourth, a single material misstatement suffices. *See e.g. In re Health Ins. Innovations Sec. Litig.*, 2019 U.S. Dist. LEXIS 141591, at *94 (M.D. Fla. June 28, 2019) (sustaining 10b-5 claim based on one misrepresentation); *cf. SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012) ("The SEC … may seek a civil penalty against any defendant who has made a single misstatement or omission"). Here, one of the false statements was written by Belisle himself (and he was copied on others). (Cmpl. ¶ 49; Doc. 16-2).

Fifth, Belisle is liable for fraudulent omissions too. *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. Dist. Ct. App. 2001) (denying summary judgment; defendant "concealed negative information"). Belisle had a duty in November and December to disclose *accurate* information to correct the prior *misstatements* falsely portraying the LDAF 2017 performance. *See e.g. FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1298-99 (11th Cir. 2011) (defendants' statements touting a system triggered a duty to disclose its defects). Belisle "had information available to him that alerted him … to the falsity of the statements about the likely impact of the 2017 hurricanes" (Cmpl. ¶ 79), but failed "to correct prior misstatements" (Cmpl. ¶ 81).[12]

---

[12] Similar principles apply to negligent misrepresentation. As explained by the Florida Supreme Court, "the party who negligently transmitted the false information may be held liable if the recipient

## THE "DISCLAIMERS" DO NOT DEFEAT EUGENIA'S CLAIM

Belisle says "allegations of fraud that are 'expressly contradicted' by a signed writing...do not state a claim for fraud and should be dismissed." (Def. Mem. at 9). .

Not so.   First, the disclaimers do not "expressly contradict" the false statements.   The 2015 Offering Memorandum (Doc. 16-6) said the expected:   the investments were "speculative" and involved "significant risk"; "natural disasters may significantly affect [funds'] results"(*Id.* at 3); predictions were "subjective judgments"; etc.   These disclaimers hardly licensed Belisle and his team to subsequently misrepresent actual data about the hurricanes and Eugenia's *2017* investments, when Eugenia was deciding on its *2018* investments.   If Belisle had issued false 2017 LDAF account statements, would the disclaimers protect him?

Second, the Florida and Eleventh Circuit courts have warned that allegations of misstatements and reliance should almost never be dismissed without a full evidentiary record.   *See Chiron Recovery Ctr., Ltd. Liab. Co. v. AmeriHealth HMO of N.J., Inc.*, 2017 U.S. Dist. LEXIS 163487, at *9 (S.D. Fla. Oct. 3, 2017) (reasonableness of reliance is often a fact question not appropriate for motion to dismiss); *Tannenbaum v. Jefferies*, 2019 U.S. Dist. LEXIS 184877, at *7-8 (M.D. Fla. Oct. 25, 2019) ("Generally, the issue of a party's reliance is a question of fact not susceptible to determination on a motion to dismiss").

---

is able to establish a negligent misrepresentation cause of action as set forth in the *Restatement (Second) of Torts* section 552...." *Gilchrist Timber Co. v. Itt Rayonier*, 696 So. 2d 334, 339 (Fla. 1997). Belisle can be liable for negligent misrepresentation for false information he directly supplied to Eugenia, and indirectly too, by directing others.   *See* comment 2(b) to *Rest. Second Torts* § 552 ("information supplied directly and indirectly").

Finally:  in Florida and the Eleventh Circuit, "a contract provision…cannot preclude a fraud claim, unless the contract expressly states that it is incontestable on the ground of fraud." *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F. 3d 1022, 1028 (11th Cir.  2017).  In *Global Quest*, a yacht purchaser sued for fraud.  He alleged that the seller represented pre-sale that the yacht would meet certain standards; but it did not.  The defendants relied upon "as is" and integration clauses in the contract. *Id.*

The District Court granted summary judgment to defendants because the pre-contract misrepresentations were "expressly contradicted" by the later agreement. The Eleventh Circuit reversed.  First, it found that *Oceanic Villas v. Godson*, 148 Fla. 454 (Fla. 1941) was binding.  It said *Oceanic Villas* holds that

> where an agreement is procured by fraud or misrepresentation "*every part of the [] contract" is vitiated* because "it is well settled that a party cannot contract against liability for his own fraud."[13]

*Global Quest,* 849 F.3d at 1027.  *Global Quest* held further that "a contract provision, including an "as is" clause,

> cannot preclude a fraud claim, unless the contract expressly states that it is *incontestable on the ground of fraud.*

*Id.* at 1028. The only exception would be if the parties had contracted and agreed upon "a specific disclaimer of liability for fraud."  Absent that, "no matter the context, 'a party cannot contract against liability for [its] own fraud." *Id.* at 1027 (quoting *Oceanic Villas, Inc.,* 148 Fla. at 690).  The Eleventh Circuit also issued a powerful warning against early dismissal:

---

[13] Unless otherwise indicated, all emphasis is supplied.

> "The District Court appears to have confused the threshold question of whether a claim is barred as a matter of law with the *later* question of whether the evidence is sufficient to survive summary judgment."

*Id.* at 1028.  The Court went on:

> "the 'as is' clause and the rest of the Purchase Agreement in this case may constitute evidence against plaintiff's fraud allegations, but *plaintiff's claims are not precluded as a matter of law.*"

*Id.* at 1028-29.  The court warned that, in fraud cases, summary judgment is "rarely proper" because

> "[T]he issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge.... fraud is ordinarily inappropriate for summary disposition; only after a full explanation of the facts and circumstances can the occurrence of fraud be determined."

*Id.* at 1029 (internal quotation omitted).[14]  Finally, as to intent and knowledge, *Global Quest* stated that "intent and knowledge – may be, and often are, proven by circumstantial evidence…" *Id.* at 1030.

*Global Quest* was reaffirmed in *Viridis Corp v. TCA Global Credit Master Fund, LP*, 721 F. App'x. 865 (11th Cir. 2018).  There, the plaintiff sued for fraud under Florida law, alleging pre-contractual misrepresentations (e.g., $10 million in financing), even though the agreement contained a broad release of claims and a waiver.  The District Court dismissed, finding that the pre-agreement representations were contradicted by the release.  The Eleventh Circuit reversed, saying the District Court "overlooked" the fact that Florida "prohibits a contractual waiver that exculpates a contracting

---

[14] The 11th Circuit noted that the two Florida cases on which the District Court had relied, *Faulk v. Weller K-F Cars Inc.*, 70 So. 2d 578 (Fla. 1954) and *Lou Bachrodt Chevrolet, Inc. v. Savage*, 570 So. 2d 306 (Fla. Dis. Ct. App. 1990), were decided on a full evidentiary record.

party's fraudulent misconduct." *Id.* at 875.  Though the release and waiver provisions were "broad in the extreme", they "do not state that they are incontestable on the ground of fraud." Id at 875-876.

*Rana Fin., LLC v. City Nat'l Bank of N.J.,* 347 F.Supp. 3d 1147 (S.D. Fla. 2018) applied *Global Quest.*  Rana Financial ("Rana") invested $300,000 in (Rana thought) defendant CNB, which had allegedly promised that the funds would go into CNB. Rana then signed a contract stating that the funds would be invested in a different entity.  CNB moved to dismiss Rana's fraud suit, saying the misrepresentations were "adequately covered or expressly contradicted in a later written contract."   The District Court denied; a party may assert fraudulent inducement

> "based upon oral statements that are contradicted by a later integrated agreement, since, if the agreement had in fact been procured through fraud, the fraud would invalidate the entire agreement"

*Id.* at 1152. (citing *Global Quest).*[15]  Likewise, in *Mantilla v. Fabian*, 284 So. 3d 575-76 (Fla. Dist. Ct. App. 2019), plaintiff sold defendant his 50% interest in a business, but later sued for fraud in the inducement.   The lower court granted summary judgment to defendant based on a contractual release of claims; Florida's Fourth District Court of Appeals reversed.   "Our Supreme Court has spoken clearly [in *Oceanic*] that no contract provision can preclude rescission on the basis of fraud in

---

[15] The Court noted *Global Quest's* principle that "contradictory" contract provisions are just *evidence* for review on a full evidentiary record.  *Rana Fin., LLC,* 347 F. Supp. 3d at 1152.  *See also Li v. Walsh,* 2017 U.S. Dist. LEXIS 114552 (S.D. Fla. July 22, 2017) (engagement letter contradicting prior oral representations does not bar a fraud claim, citing *Global Quest*); *Silver Creek Farms, LLC v. Fullington*, 2018 U.S. Dist. LEXIS 62993 (S.D. Fla. 2018) (trial necessary to test alleged fraudulent representations made in advance of a Bill of Sale containing "as is" clause;  citing *Global Quest*).

the inducement unless the contract provision explicitly states that fraud is not a ground for rescission." *See also Smith v. Jackson,* 2017 U.S. Dist. LEXIS 39514 (S.D. Fla. Mar. 19, 2017) (denying motion to dismiss, citing *Global Quest;* agreement procured by fraud vitiates every part of a contract; party cannot contract against liability for his own fraud).

Silent on all this, Belisle cites cases (most pre-*Global Quest)* with four elements 1) an earlier oral statement 2) about the terms of a subsequent contract 3) directly contradicted by 4) the terms of the subsequent written contract. *See Padilla v. Padilla*, 278 So. 3d 333, 334 (Fla. Dist. Ct. App. 2019) (oral statement by daughter that father would not be responsible for loan directly contradicted by language of subsequent loan contract saying he was responsible for loan); *Potje v. Bluegreen Vacation Corp.*, 2018 U.S. Dist. LEXIS 236897, at *9-11 (S.D. Fla. Mar. 6, 2018) (oral statements on terms of a timeshare precisely contradicted by subsequent purchase agreement); *Leader Global Sols. LLC v. Tradeco Infraestructura*, 155 F. Supp. 3d 1310, 1319 (S.D. Fla. 2016) (alleged oral modification of sales agreement directly contradicted by terms of subsequent written invoice that did not reflect alleged oral modification); *Topps, Inc. v. Uniden Am. Corp.,* 513 F. Supp. 2d 1345, 1350 (S.D. Fla. 2007) (precontractual promise about supply of cell phone stock directly contradicted by terms of subsequent contract). Cases following this pattern—precontractual oral statement specifically contradicted by later fully integrated writing—are a narrow and unusual class of "disclaimer" cases, dependent on elements absent here.

First, Belisle and his team's statements were written. There are no oral promises that would "invite contracting parties to make [written] agreements …and then avoid them by… swearing that they relied on some other statement…." *Tevini v. Roscioli Yacht Sales, Inc.*, 597 So. 2d 913, 914 (Fla. Dist. Ct. App. 1992).

Second, the misstatements did not concern a proposed contract. Belisle misled Eugenia with specific statements about Eugenia's existing 2017 investments.

Third, the disclaimers do not directly contradict Belisle's misstatements about Fund performance. Belisle offers this illustration of a direct contradiction: "For example, a plaintiff cannot (i) sign a loan agreement that states that he will repay the loan, and then (ii) claim that he was misled into signing the agreement by an oral statement that someone else would repay the loan." (Def. Mem. at 9) (*citing Padilla*). But no reasonable investor would have understood disclosures about risk in the original investor materials to negate subsequent reports by the investment managers about actual investment performance in light of real-world events. Belisle asks this Court to decide that an investment manager's statements to investors about the status of their investments should be "unreliable" as a matter of law because the original investor materials contained generalized disclosures about the investment's riskiness. But those materials did not (of course) warn investors against relying on *subsequent* statements concerning new developments. [16]

---

[16] Belisle says that Investment One (the $20 million rollover into 2018) and Investment Two (the $10 million investment) "were made in connection with the April 2016 subscription agreement" (Def. Mem. at 11). He implies that his misleading statements of August to October 2017 were thus *pre*-contract, because the terms in the 2015 Offering Memorandum were "renewed" before Eugenia's

And the Complaint alleges omissions, as well as affirmative misstatements. Since  Belisle's statements of August to October, 2017 about the hurricanes were not accurate in November and December (disastrous 2017 results were announced on January 18, 2018), Belisle had a duty to correct those misstatements—not perpetuate them with silence —before Eugenia was committed to its 2018 investments.

## NEGLIGENT MISREPRESENTATION (COUNT TWO)

The elements of a negligent misrepresentation claim under Florida law are essentially the same as those for fraudulent misrepresentation, except that, instead of defendant's knowledge of the statement's falsity, a plaintiff need only prove that the defendant reasonably should have known of the statement's falsity; and a plaintiff must show that the reliance was "justifiable."  *Tannenbaum,* 2019 U.S. Dist. LEXIS 184877 at *7; *Butler v. Yusem,* 44 So. 3d 102 (Fla. 2010).

As to Belisle's state of mind, the allegations meet fraud's knowing falsity requirements, and thus (a fortiori) the lesser requirements of negligent misrepresentation.  Plaintiff alleges that Belisle was at the very least negligent in his statements, in that insider and expert industry information was available that should have alerted him that his assessments were wrong.

As to justifiable reliance, the Supreme Court of Florida has explained that "a recipient of an erroneous representation cannot 'hide behind the *unintentional*

---

2018 investments.   First, as to Investment One, the funds were simply rolled over into 2018 because Eugenia did not redeem.   As to Investment Two: it would defy the plain meaning of words and chronology to suggest that disclaimers issued in 2015 somehow protect Belisle against misleading statements made in late *2017* about profits and losses in Eugenia's *existing* LDAF investments for *2017*, when Eugenia was considering a supplemental investment for *2018*.

*negligence* of the misrepresenter when the recipient is *likewise negligent* in failing to discover the error." *Butler,* 44 So. 3d at 104. Here, with thirty years' experience in the highly specialized industry, Belisle had a wealth of facts and expertise available to him that Eugenia did not.   On a motion to dismiss, a court does not decide whether a Plaintiff's reliance was reasonable in light of prior warnings.[17]

## CONCLUSION

For the foregoing reasons, defendant Belisle's motion to dismiss should be denied in its entirety.[18]

Dated: February 16, 2021

FISHER RUSHMER, P.A.

By:   */s/ John E. Fisher*
 John Edwin Fisher, Esq.
 jfisher@fisherlawfirm.com
390 North Orange Avenue
Suite 2200
Orlando, Florida 32801
407-843-2111
407-422-1080 (Facsimile)

*Of Counsel*
Sullivan & Worcester LLP
Paul E. Summit, Esq.
1633 Broadway
New York, NY 10019
psummit@sullivanlaw.com

---

[17] *See Chiron Recovery*, 2017 U.S. Dist.  LEXIS 163487, at *10  (citing as examples *Brady v. Medtronic, Inc.,* 2015 U.S. Dist. LEXIS 179667, at *6 (S.D. Fla. Mar. 20, 2015); *Great Fla. Bank v. Countrywide Home Loans, Inc.,* 2010 U.S. Dist. LEXIS 109628 at *5 (S.D. Fla. Oct. 13, 2010*); Point Blank Sols., Inc. v. Toyobo America, Inc.,* 2010 U.S. Dist. LEXIS 117477at *5 (S.D. Fla. Nov. 4, 2010)).

[18] Should the Court disagree for any reason, Eugenia would respectfully seek the opportunity to file an amended complaint.

Solomon & Cramer LLP
Andrew T. Solomon, Esq.
25 West 39th St., 7th floor
New York, NY 10018
asolomon@solomoncramer.com

## CERTIFICATE OF SERVICE

I, John Edwin Fisher, local attorney for Plaintiff, Eugenia II Investment Holdings, Limited (BVI), hereby certify that on this 16th day of February, 2021, this document filed though the ECF system will be served electronically to the registered ECF participants as identified on the Notice of Electronic Filing (NEF).

*/s/  John E. Fisher*
John Edwin Fisher, Esq.